LEE ᴀ. FLEMING, Temporary Controls Administrator.

No. 270.

United States Emergency Court of Appeals.

Heard at Milwaukee Aug. 28, 1946.

Decided Dec. 13, 1946.

As Amended Dec. 14, 1946.

Werner J. Trimborn, of Milwaukee, Wis. (Walter H. Bender, of Milwaukee, Wis., on the brief), for complainant.

Betty L. Brown, Atty., Office of Price Administration, of Washington, D. C. (Richard H. Field, Gen. Counsel, Carl A. Auerbach, Associate Gen. Counsel, and William R. Ming, Jr., Chief, Court Review Price Branch, all of Office of Price Administration, all of Washington, D. C., on the brief), for respondent.

Before MARIS, Chief Judge, and Mc-ALLISTER and LINDLEY, Judges.

MARIS, Chief Judge.

The complainant is engaged in Milwaukee in the milling, by a special stone-grinding process, of whole wheat flour from wheat grown in Deaf Smith County, Texas. The complainant calls his product Deaf Smith Flour and he claims for it nutritional value higher than that of the so-called standard or commercial whole wheat flours. He bases this claim both upon the method of milling by which approximately 95% of the wheat berry, including its essential oils, minerals and vitamins, is recovered and upon the type of wheat used. He asserts that the soil of Deaf Smith County, Texas, contains far more than the normal amount of phosphorus and calcium and that this is reflected in the mineral content of the wheat grown there.

Revised Maximum Price Regulation No. 296, issued November 30, 1943,[1] established dollars and cents maximum prices for sales of wheat flour, semolina and farina. Section 16(6) (iii) states that flour from wheat includes whole wheat flour. Section VI of Appendix A, as amended,[2] provides the following maximum prices for sales of small packages of family cake flour and family whole wheat flour, which are the maximum prices applicable to sales of complainant's flour:

"VI. Maximum prices for family cake flour, and family whole wheat flour, and for

---

[1] 8 F.R. 16282.

[2] Amendment 3, issued May 31, 1944. 9 F.R. 5985.

family farina, enriched and unenriched.— (a) At all destinations, the maximum prices for family cake flour and family whole wheat flour shall be as follows:

"1. When packed 12 2-3/4 pound packages or 24 1¼ pound packages to the case, $2.75 per case. When packed in cases of other sizes the maximum price shall be determined by dividing $2.75 by 12 when pricing 2-3/4 pound packages and by 24 when pricing 1¼ pound packages and multiplying the applicable result by the number of packages packed in the case.

"2. When packed in packages containing 5 pounds or less, other than the package and case sizes covered by 1 hereof, 7-1/3 cents per pound plus the cost of packages, labels and shipping containers."[3]

The prices which complainant charged for his Deaf Smith Flour, both before and after the issuance of RMPR 296, were substantially in excess of the maximum prices fixed by that regulation. In January, 1945 the Price Administrator commenced an action against the complainant in the United States District Court for the Eastern District of Wisconsin seeking an injunction against further violation of the regulation and treble damages for violations theretofore committed. On August 4, 1945 judgment was entered in that action against the complainant. Thereafter the District Court granted the complainant leave under Section 204(e) of the Emergency Price Control Act, 50 U.S.C.A. Appendix, § 924(e), to file in this court the present complaint which seeks to have RMPR 296 declared invalid as to the complainant.

The administrator filed an answer to the complaint which raised certain issues of fact. This court granted leave to the complainant and the Administrator to introduce evidence which, at the Administrator's request, was presented to him in the first instance. A transcript of that evidence was subsequently filed by the Administrator in this court accompanied by a statement by him with respect thereto. From the pleadings and the evidence after full argument we find the pertinent facts to be as follows:

Specially milled whole wheat flours of the type and kind of Deaf Smith Flour have been and are produced in various parts of the country and throughout the world. These flours, sometimes termed "whole meal flours," are ordinarily stone-ground and their distinctive feature is the retention in the flour of substantially all of the germ, bran and endosperm of the wheat berry in nature's exact proportion. Standard, commercial whole wheat flours, on the other hand, are ordinarily produced by the roller milling process by which commercial white flours are now almost universally produced. The Administrator in his statement of considerations accompanying RMPR 296 described that process as follows:

"To prepare wheat for milling, it is first cleaned by screening and often washed to remove dirt and other foreign matter. The grain is adjusted to the exact moisture content desired by either drying or wetting and is then ready for the milling process. This consists of a gradual reduction or crushing of the wheat berry in a number of stages. In the first of these, the wheat moves through two corrugated metal rollers which crack the berry without actually pulverizing it. A sifter then separates the crushed product into stocks of various granulations, some of which are flour. The coarser stocks go on through five or six other 'breaks' and siftings until all the bran, middlings and germ have been separated from the finely ground flour.

"Some flour is obtained at each separation. The many operations give rise to numerous 'streams', each of which has different baking characteristics. When the various streams are all combined, the flour is known as 'straight'. Usually the streams are separated or mixed in certain special combinations. The poorer ones are called 'clears' and 'cut-offs'. When they have been taken out, the balance is known as a 'patent'."

---

[3] Amendment 11 to RMPR 296, issued and effective on August 2, 1946, increased the delivered price east of the Rocky Mountains of all flours $1.11 per cwt. to compensate for removal of the subsidy and increased wheat costs (11 F.R. 8485).

In the production of standard or commercial whole wheat flour by the roller milling process the practice often followed is to add selected streams of middlings to selected streams of white flour, the proportions being chosen to give the required quality and characteristics. Others produce whole wheat flour by weighing the appropriate quantities of white flour and middlings into a batch mixer. In either case, the particles of endosperm are sometimes treated with chemical agents to obtain bleaching and artificial aging effects.[4]

In the production of his Deaf Smith Flour complainant uses a specially designed stone-grinder mill which is capable of milling to an unusual degree of fineness all but a small percentage of the wheat berry, only about 5% of the berry being eliminated from the flour in the bolting process. The grinding of the flour to extraordinary fineness is intended to eliminate hard particles which may be irritating and the flour produced by the complainant has a fineness which permits its use instead of standard commercial flours for most purposes. At the same time it contains approximately 95% of the essential oils, minerals and vitamins of the original wheat berry. As a result of the use of the stone-grinding process such flour carries a much larger proportion of the thiamine of the wheat than do flours milled by the roller milling process. The complainant's flour is not bleached or sterilized. It is milled in small quantities each day and is shipped to customers immediately since, because of its character, it attracts insects.

Specially milled whole wheat flours of the type and kind of Deaf Smith Flour have for many years been recognized in the trade as being different and distinctive from the standard, commercial whole wheat flours produced by the ordinary roller milling process. By reason of what is believed by many physicians and other members of the public to be their higher nutritional values they are sold to hospitals, sanitariums, health food stores and bakers of health bread throughout the country.

Thus complainant's Deaf Smith Flour is intended primarily for use in the daily diet of sufferers from malnutrition and is prescribed for that purpose by many physicians.

The cost of milling specially milled flours of the type of Deaf Smith Flour is far higher than the cost of producing roller milled flours because the process requires a much longer time (60 minutes per bushel of grain) to mill the entire wheat berry than is required by the roller milling process. Millers of commercial flours by the roller milling process are able to mill flour in large quantities, store it indefinitely and ship it without danger of insect infestation, whereas millers of specially milled flours are limited in production to quantities that can be delivered to customers and actually used within comparatively short periods of time unless they are willing to incur the expense of storage under refrigeration. As a result specially milled flours of the type of Deaf Smith Flour have at all times been sold at prices higher than those paid for standard commercial whole wheat flours. Thus complainant since the year 1930 has produced flour of the type of Deaf Smith Flour and has sold it at all times for the identical prices which he charged subsequent to the issuance of RMPR 296 and which were substantially in excess of the maximum prices for whole wheat flours permitted by that regulation.

We must at this point pause to consider our power to make findings of fact, as we have just done, upon our independent consideration of the evidence. The Administrator urges that since the evidence was ordered presented to him in the first instance and since he has considered it and in his statement filed with the transcript has made findings of fact, we are precluded from making such findings but must accept those which he has made if they are supported by substantial evidence. He suggests that the situation should be and is the same as if the complaint had been filed under Section 204(a) of the act following the denial of a protest against the regulation

[4] Some of the findings contained in this paragraph are based upon facts judicially noticed. See J. F. Lockwood, Flour Milling (1945), pp. 406, 407; Food and Drug Standards of Identity, May 26, 1941, Findings of Fact Nos. 58 and 64, 6 F.R. 2577, 2578.

and the Administrator had made findings of fact in the opinion accompanying his order denying the protest. We have held that in the latter case we would be bound by the Administrator's findings if properly supported by the evidence.[5]

We do not agree that the two cases are analogous, however. A protest proceeding is an administrative proceeding in which the Administrator hears the objections of a person aggrieved by a regulation or order and decides whether the objections are well taken. The Administrator's action in the protest proceeding must, of course, be based upon the facts and he must, therefore, necessarily determine what the facts are.[6] A proceeding begun in this court under Section 204(a) upon the denial of a protest involves the judicial review of the action taken by the Administrator following the hearing given in the protest proceeding. Patterned on the review of orders of the Interstate Commerce Commission by a three-judge district court under the Urgent Deficiencies Act the review in this court in a Section 204(a) proceeding is similarly limited in its scope. In conformity to the customary pattern of such judicial review of administrative determinations the findings of the Administrator, if supported by substantial evidence, are treated as conclusive.

The plan of the Emergency Price Control Act, as originally enacted, was to require all persons who sought to have a regulation or order declared invalid to present their objections first to the Administrator and have them passed on by him in a protest proceeding. By the addition in 1944 of subsection (e) to Section 204, however, this plan was modified to the extent of permitting, under the circumstances specified in the subsection, the initial determination of the validity of a regulation or order to be made by this court. The determination is to be made by this court in an original suit brought with leave of the court in which an enforcement proceeding for violation of the regulation or order has been instituted. A suit in this court under Section 204(e) is, therefore, not in any sense a review of the result of a prior administrative hearing, since there has been none, but on the contrary is ancillary to the enforcement suit in which the question of validity has arisen and is in aid of the determination of that suit.[7] The Administrator, therefore, appears in a suit brought under Section 204(e) solely as a party to the suit and not as an administrative officer whose prior determination of the question at issue is under judicial review.

Were it not for the provisions of Section 204(d) of the act[8] the court in which an enforcement suit is brought would consider and decide the validity of the regulation or order involved in the suit if its invalidity was asserted as a defense. Such a determination would be made upon findings made by that court upon the evidence before it. We think that in the absence of a clear statutory direction to the contrary the same rule is applicable to an ancillary suit which is brought in this court under Section 204(e) with leave of the enforcement court for the purpose of deciding for that court the validity of the regulation or order in question before it. The suggestion that a party to a controversy which is pending in a court for determination should have the right, pendente lite, to adjudicate factual issues involved in the litigation, is startling, to say the least. For such action would not only appear to involve the usurpation of judicial power which is vested in the courts alone, but would also clearly be

[5] Rabkin v. Bowles, Em.App., 1944, 143 F.2d 600; White v. Bowles, Em.App., 1945, 150 F.2d 408; Jacob Goodman & Co. v. Porter, Em.App., 1946, 156 F.2d 549.

[6] Smith v. Bowles, Em.App., 1944, 142 F.2d 63.

[7] See Conklin Pen Co. v. Bowles, Em. App., 1946, 152 F.2d 764.

[8] "Except as provided in this section, no court, Federal, State, or Territorial, shall have jurisdiction or power to consider the validity of any such regulation, order, or price schedule, or to stay, restrain, enjoin, or set aside, in whole or in part, any provision of this Act authorizing the issuance of such regulations or orders, or making effective any such price schedule, or any provision of any such regulation, order, or price schedule, or to restrain or enjoin the enforcement of any such provision." 50 U.S.C.A.Appendix, § 924(d).

at war with the fundamental concept of due process of law that parties to controversies are entitled to have them determined by an impartial tribunal.[9]

We are aware of the requirement of Section 204(e) that in a case brought under that section the evidence is to be presented, in the first instance, to the Administrator if he so requests.[10] Section 204(a) which Section 204(e) incorporates by reference, expressly directs the Administrator thereupon to "certify and file with the court a transcript thereof and any modification made in the regulation, order or price schedule as a result thereof." Our Rule 15(b) authorizes the inclusion in the transcript of a statement or opinion of the Administrator with respect to the evidence. While the Administrator's statement or opinion, if included, may be helpful to us in adjudicating the issues involved, there is nothing in either statute or rule which compels us to adopt any findings which the Administrator's statement or opinion may contain or to abdicate our responsibility, as a court having "the powers of a district court,"[11] to make findings of fact and thereupon to decide the issues which the case presents. It may be suggested that the statute contemplates that the Administrator shall function as a master with the duty to make findings of fact and that under Civil Procedure Rule 53(e) (2)[12] his findings must be accepted by the court unless clearly erroneous. But we think that the act intends that he shall serve merely as an examiner to receive the evidence and report it to the court without any duty or power to make findings of fact therefrom.

We return then to the questions which the case now before us presents. The complainant contends that RMPR 296 is arbitrary in classifying specially milled whole wheat flours with standard commercial whole wheat flours as one commodity and in fixing a ceiling price therefor which by not taking account of the higher produc-

tion costs and historically higher prices of the specially milled flours has in effect rendered their production impossible. In this connection it should be noted that the Administrator in his statement of considerations accompanying RMPR 296 did not mention or refer in any way to these specially milled whole wheat flours and in his brief in this court took the position that it "would be patently inflationary and inconsistent with the purposes of the Emergency Price Control Act to permit the diversion of wheat into a type of flour selling at the higher price." It thus appears that the Administrator's position is that the producers of specially milled whole wheat flours are merely high cost marginal producers of whole wheat flour who are not entitled to be protected in their historical price differential but must fall by the wayside if they cannot do business at the prices fixed for standard commercial whole wheat flours.

In taking this position we think that the Administrator fell into error. For he ignored the fact, which the evidence in this case establishes, that specially milled whole wheat flours of the type of Deaf Smith Flour are believed by many physicians and others to have special nutritional value as a result of the retention of substantially all of the wheat berry without bleaching or other artificial treatment of any portion of it and in nature's exact proportions. Instead of recognizing that a portion of the community believes this to be so and has historically been willing to back up that belief with its money by paying the higher prices which the greater cost of stone-grinding makes necessary, he argues at length that these specially milled whole wheat flours do not in fact have the advantages claimed for them. He thus enters upon a field which has been long and vehemently debated but which is wholly outside his province of price control. To those who earnestly believe that stone-ground whole wheat flour is necessary to their health and well being and who have customarily purchased

---

[9] Tumey v. Ohio, 1927, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749, 50 A.L.R. 1243; Berkshire Employees Ass'n of Berkshire Knitting Mills v. National Labor Relations Board, 3 Cir., 1941, 121 F. 2d 235.

[10] See 150 E. 47th St. Corp. v. Porter, Em.App., 1946, 157 F.2d 682.

[11] Sec. 204(c), Emergency Price Control Act of 1942, 50 U.S.C.A.Appendix, § 924(c).

[12] 28 U.S.C.A. following section 733c.

such flour at the higher level of prices at which it has historically sold, the Administrator says, in effect, not that they may not buy it at inflationary prices but that they may not buy it at all since standard commercial whole wheat flour is just as good for them and may be produced more cheaply.

From the evidence in this case we have found that specially milled whole wheat flours of the type of Deaf Smith Flour have long been recognized in the trade as being distinctive and different from standard commercial whole wheat flours in manner of milling and other characteristics. We have also found that they have been purchased for use in the diet of sufferers from malnutrition and others by reason of the higher nutritional value which they are believed to possess, and that because of their greater cost of milling they have historically commanded a higher price than standard commercial whole wheat flours. In this situation we think it was arbitrary for the Administrator to classify the specially milled whole wheat flours with the standard commercial whole wheat flours for price control purposes instead of treating the specially milled whole wheat flours as a distinct commodity to the extent, at least, of preserving in RMPR 296 the price differentials which those flours had historically enjoyed in the prewar economy. In doing what he did the Administrator was not acting to prevent inflation since the specially milled flours had always sold for a higher price. On the contrary he was reducing the price of a recognized commodity because he regarded it as unnecessary to the economy and for the purpose, as he now asserts, of discouraging the use of wheat in its production. This was beyond his power under the act.

For the reasons stated we conclude that RMPR 296 was invalid from its inception insofar as it applies to specially milled whole wheat flours of the type of Deaf Smith Flour.[13] In view of this conclusion it becomes unnecessary for us to decide the question, much discussed in both evidence and argument, whether complainant's flour produced from wheat grown in Deaf Smith County Texas, has qualities which render it superior in mineral content to flours produced from wheat grown elsewhere. For it appears that the cost of Deaf Smith County wheat is no greater than that of other wheat and that the price which the complainant has customarily charged for his Deaf Smith Flour is the same as he formerly charged for his specially milled whole wheat flour when it was produced from other wheat.

By Executive Order 9809, effective December 12, 1946, 11 F.R. 14281, the Office of Price Administration and certain other agencies were consolidated to form the Office of Temporary Controls and the functions of the Price Administrator were vested in the Temporary Controls Administrator, including the authority to maintain in his own name civil proceedings relating to matters heretofore under the jurisdiction of the Price Administrator (including any such proceedings now pending). Pursuant thereto and on motion of counsel for the Temporary Controls Administrator that officer has today been substituted for the Price Administrator as Respondent in this case.

A judgment will be entered declaring that Revised Maximum Price Regulation No. 296 was invalid from its inception insofar as it applied to specially milled whole wheat flour of the type of complainant's Deaf Smith Flour.

---

[13] Since all foods with exceptions not here relevant were removed from price control on October 24, 1946, (11 F.R. 12621), no prospective relief is called for.