190 F.2d 314
 SHERWOOD DISTILLING CO.
v.
RYAN, Director.
 No. 535.
 United States Emergency Court of Appeals
 Heard at Washington February 23, 1951.
 Decided June 29, 1951.
 As Amended on Denial of Rehearing August 22, 1951.
 
 COPYRIGHT MATERIAL OMITTED Wilson K. Barnes, Baltimore, Md., with whom William Hoffenberg and Anderson & Barnes, all of Baltimore, Md., were on the brief, for the complainant.
 Israel Convisser, Attorney, Department of Justice, Washington, D. C., with whom Messrs. J. Howard McGrath, Atty. Gen., James M. McInerney, Asst. Atty. Gen. and Floyd L. Cook and Charles G. Mulligan, Attorneys, Department of Justice, Washington, D. C., were on the brief, for the respondent.
 Before MARIS, Chief Judge, and MAGRUDER and McALLISTER, Judges.
 MARIS, Chief Judge.
 
 
 1
 The complainant, Sherwood Distilling Company, seeks a judgment setting aside certain orders of the Director, Division of Liquidation, Department of Commerce, on the ground that they and certain regulations under which they were issued are invalid. The complainant, the operator of a whiskey distillery, converted part of its plant to produce ethyl alcohol and high wines pursuant to a contract with Defense Supplies Corporation. Maximum prices for the alcohol and wines were established by a formula set forth in the regulations[1] which were computed by adding to a fixed profit per gallon the sum of cost items less credit for the recovered value of various by-products. The prices were determined on the basis of costs of a calendar quarterly period. A report of the prices thus computed was made by the producer to the Office of Price Administration within 20 days after the end of each quarter. These reports were audited and were subject to disapproval "in writing at any time" by the OPA.
 
 
 2
 In order to expedite the program, it appears to have been the practice of Defense Supplies Corporation to pay for the alcohol produced at the reported prices of the producer. The regulations, however, provided that after such payment in case of a revision downward in the reported prices the producer would be required to refund the excess paid.
 
 
 3
 The complainant produced ethyl alcohol and high wines in accordance with the contract. Its reports covering quarterly periods from July 1944 to August 1945 were disapproved and adjustments were made downward. Orders L-35, L-40, L-172 and Amendment 1 thereto, and L-215 were issued advising the complainant of the revision downward. The complainant filed a protest challenging the validity of the regulations and orders under which the downward adjustments were promulgated. The Director submitted the protest to a board of review. Following his order of June 28, 1950, sustaining some but rejecting most of the complainant's objections, the present complaint was filed in this court.
 
 
 4
 The complainant contends that the regulations and orders are invalid as a matter of law for a number of reasons each of which we shall discuss. In discussing the regulations, MPR 28 and Order 108 will be referred to as "regulations" and the letter orders which adjusted complainant's prices downward will be referred to as "orders".
 
 
 5
 The first objection raised is that the regulations and orders are invalid because they operate retroactively. This objection is hardly consistent with the complainant's second objection which is based upon the premise that the regulations and orders may operate retroactively if the period is limited to a reasonable one. But since the complainant vigorously argues the point we will discuss it. The objections cannot be directed to the regulations since they themselves did not have retroactive effect but merely provided for retroactive audits and revisions of complainant's costs as reported quarterly in the future. Thus while it is true that retroactive effect was given to the letter orders embodying the results of OPA audits of complainant's reported costs this was in the light of express provision therefor in the regulations which were in force during the entire period of complainant's operations. Since the regulations thus reserved power in the Administrator to make adjustments in the prices reported, the orders making such adjustments with retroactive effect were clearly within the bounds of propriety and authority. Indeed under the cost-plus contract between the complainant and Defense Supplies Corporation such retroactive auditing was obviously necessary if, as occurred, the complainant was to receive preliminary payment on the basis of its own statements of cost.
 
 
 6
 The next point raised by the complainant is that the orders are invalid because they operate "unreasonably retroactively". The complainant contends that 3 months is the limit of a reasonable period for the auditing of its reports. There is no merit in this contention. The regulations provide that the maximum prices established by the producer are subject to disapproval "at any time" by the OPA. The phrase is unqualified and must be given its natural meaning. Charles R. Krimm Lumber Co. v. Turney, Em.App., 1948, 168 F.2d 72, 73; Utah Junk Co. v. Porter, 1946, 328 U.S. 39, 44, 66 S.Ct. 889, 90 L. Ed. 1071. Indeed we recently so held at the instance of this very complainant with respect to the same phrase in connection with the time of its filing of the protest involved in the present case.
 
 
 7
 The complainant next contends that the Administrator exceeded his scope of authority by putting into effect regulations unnecessary for the effectuation of the Act. We have already pointed out that the regulation authorized the issuance of orders which had retroactive effect. That they were necessary is also clear since it was only through such orders that the prices to be received by the complainant could be adjusted to meet the requirements of the regulation.
 
 
 8
 Another attack on the regulations and the orders is on the ground that they are not "of general applicability and effect" as required by Section 2(a) of the Emergency Price Control Act, 50 U.S.C.A. Appendix, § 902(a). The complainant's contention is that the regulations, MPR 28 and Order 108, contemplate contracts only with a government agency in which case the agency itself can prevent excessive prices as effectively as the Administrator and that nothing in the Act contemplates the regulation of sales made to a government agency. To pose the question is to answer it. There is nothing in the Act to imply any distinction in the procedure by which prices were to be established for sales to the government as distinguished from sales to others. This argument is without merit. See Marlene Linens v. Bowles, Em.App., 1944, 144 F.2d 874. Moreover orders notifying the complainant of the revisions downward were not required to be of general applicability. Section 201(d) of the Act, 50 U.S.C.A. Appendix, § 921(d), empowered the Administrator to "issue such regulations and orders as he may deem necessary or proper in order to carry out the purposes and provisions" of the Act. As we have already pointed out these orders were obviously necessary under the circumstances.
 
 
 9
 The complainant raises the point that MPR 28 and Order 108, by limiting general and administrative expense to 3¢ and 1½¢, respectively, per gallon, violates Section 2(a) of the Act by requiring the determination of costs otherwise than in accordance with established accounting methods. This provision, however, is not a change in accounting methods but is merely a limitation on the amount of allowable costs. Any costs incurred by the producer over that amount were not reimbursable by Defense Supplies Corporation. Furthermore, this provision is part of the complainant's contract, since the contract provided that the purchase price for the alcohol should be the maximum prices determined in accordance with appropriate regulations of the OPA. The regulations involved were in force at that time. The complainant has no standing to complain now about the method by which the prices were computed or the amount of costs which were to be reimbursed. These were matters known and agreed to by it at the time of contracting.
 
 
 10
 The complainant attacks the validity of these orders on the ground that no statements of considerations were issued with them. This argument is fallacious. The statements of considerations were issued at the time the regulations were issued. The orders were issued under Section 2(d) of the Act and were supplementary to the regulations. They were completely self-explanatory and involved only the matter of auditing the reports made by the complainant to the OPA.
 
 
 11
 Complainants raise the question that the orders lacked finality and were therefore invalid. This was necessarily so because accounting problems were involved which were always subject to possible later adjustment. However, the only vice in the lack of finality would be the inability to secure review of the order. It is clear that the complainant had adequate remedy for review, concrete evidence of which is the present review.
 
 
 12
 The complainant says that several of the orders are invalid because they were not signed by an official appointed by the President and confirmed by the Senate. The answer is contained in Section 201(a) of the Act in which the Administrator was authorized to "appoint such employees as he [deemed] necessary in order to carry out his functions and duties under this Act," and in § 201(b) which provided that "any duly authorized representative may exercise any or all of his powers in any place." See Schiefla v. Clark, Em.App., 1947, 163 F.2d 685, 686-687.
 
 
 13
 The complainant further contends that Supplementary Order 193, issued November 12, 1946, effective November 10, 1946, 11 F.R. 13,464, removing future controls deprived the Administrator and his successors of power to make the adjustments in the maximum prices for ethyl alcohol and high wines. There is no merit in this contention. Section 1(b) of the Act, 50 U.S.C.A. Appendix, § 901(b), saved the rights and liabilities of the complainant and Defense Supplies Corporation under the contracts and the pertinent regulations as they stood before the issuance of Order 193. The Price Administrator and his successors accordingly had power under Section 1(b) of the Act to issue the letter orders which were required to define those rights and liabilities.
 
 
 14
 In considering the complainant's protest the Director found that there had been an error in Amendment 1 to Order L-172 in restoring certain disallowances. In his opinion of April 6, 1948 he noted this error and stated that it would be corrected in the final order issued in this case. The complainant contends that on the basis of time limitation the Director was precluded from recapturing this amount, but the complainant does not point out to us that the Director's calculations are wrong. We see no reason why the Director should not be permitted to correct any errors he finds upon examination of the record. We do not think it was a violation of the law for the Director to correct in the protest proceeding the error thus found.
 
 
 15
 It follows from what we have said that the regulations and orders are not invalid as a matter of law. The complainant, however, also attacks the orders upon the ground that by the orders the Director arbitrarily and capriciously disallowed certain costs claimed by complainant in computing its maximum prices and arbitrarily and capriciously sustained certain credits taken by the OPA in the computation. These accounting questions present the real meat of this case. At the outset we think it should be recalled that it is the duty of a contractor under a contract on a cost-plus basis to keep adequate records to justify the actual costs reported and further to keep the usual documents to substantiate its claims for reimbursement. Shaw v. Bula Cannon Shops, 1949, 205 Miss. 458, 38 So. 2d 916, 918. Failure of the complainant to do so is the cause of much of the controversy in this case.
 
 
 16
 This accounting phase of the case is complicated by the fact that the complainant's business was not solely devoted to the production of alcohol and wines for the government. Part of its distillery had been converted to the production of these products but the complainant still continued to carry on its bottling business and it produced whiskey during the periods, known as whiskey holidays, when the production of whiskey was permitted. Some of the complainant's expenses were incurred for the entire plant and in some instances the complainant failed to keep the expenses of the alcohol program separate. It was necessary, therefore, in auditing the costs reported, to take into account some of the expenses which had been incurred in the complainant's private enterprise. A dispute arose as to the apportionment of these expenses and because of the Director's refusal to allow certain of its costs to be charged against the alcohol program. This controversy, therefore, raises issues of fact upon the review of which we are bound by the Director's findings if they are supported by substantial evidence. Rabkin v. Bowles, Em.App., 1944, 143 F.2d 600; White v. Bowles, Em.App., 1945, 150 F.2d 408; Jacob Goodman & Co. v. Porter, Em. App.1946, 156 F.2d 549; Lee v. Fleming, Em.App., 1946, 158 F.2d 984, 987, certiorari denied 331 U.S. 805, 67 S.Ct. 1186, 91 L. Ed. 1826. We accordingly turn to consider the various objections raised.
 
 
 17
 A. Empty Grain Sacks.
 
 
 18
 This is a dispute over $295.99 which represents a credit taken by OPA for grain sacks which was applied by OPA against raw materials costs. It appears that the cost of grain purchased for the alcohol operation included the sacks in which the grain was packaged. This entire cost was charged as an alcohol cost and allowed by the Director. Generally, when the sacks were emptied, they were returned to the vendor for credit. The Director applied a credit of $295.99 to the raw material costs representing the sacks paid for in Government alcohol raw materials costs. The complainant contends that it has no credits on its book for these sacks, that there are no sacks in its possession, and that there is nothing to suggest that there was any improper handling of this situation, so that it was error for the Director to charge the complainant with an item for which it had not received any money or benefit. The Director, however, concluded that: "Under a cost-plus pricing program, the Director finds it necessary to assume reasonable prudence on the part of the operators, and therefore the unexplained disappearance of $295.99 of creditable values, representing a substantial quantity of used sacks, cannot be accepted as justification for the reinstatement of this claim."
 
 
 19
 We do not think the Director was wrong in so holding.
 
 
 20
 B. Third-Quarter Rye Costs.
 
 
 21
 The complainant alleges that the rye consumed in government production from and after August 7, 1945 should not have been included at its average cost but, instead, at the rate of the prevailing market price, or "the new price of $1.8289 per bushel." The Director stated that the complainant has not shown that this was the cost of the rye actually consumed in government consumption. As of the close of business on June 30, 1945 the government granted a "whiskey holiday". The average cost of rye on hand at this time was $1.74. The holiday ended August 8, 1945, when the complainant resumed production of alcohol under its contract. The average cost of the rye then on hand was $1.77. The complainant's position is that during the period of the holiday in which whiskey was manufactured, the grain on hand was used for the manufacture of whiskey. During the interim period, the cost of grain had advanced in price so that when the alcohol program was resumed, the complainant paid $1.83 per bushel. It contends that this started a new basis for the calculation of the costs of grain and that this cost should be used rather than averaging the cost over a period from June 30, 1945. The complainant concedes that at the end of the period it received $1.82 per bushel when it was given the option to sell the grain to the Defense Supplies Corporation at cost plus carrying charges, but contends that this indicates that the basis used by the government is wrong. An affidavit of James J. Ford, Chief of the Alcohol Audit Branch of Division of Liquidation, Department of Commerce, described the method used as follows: "I have examined the auditor's records with respect to the calculation of Sherwood Distilling Company's August 7, 1945 inventory and find that an average cost was computed as for that date and that the June 30, 1945 average inventory cost was not used. In establishing the August 1945 rye cost, our accountants added to August 7, 1945 inventory cost the additional purchases made to the end of the month and subtracted the value of the closing inventory as of August 30, 1945, thus determining the cost of the rye consumed."
 
 
 22
 In view of the fact that the average cost method is consistent with the method followed by the complainant previous to the whiskey holiday, it seems that the conclusion of the Director was correct. We find no error in the decision of the Director on this point.
 
 
 23
 C. Wages for Repair and Maintenance.
 
 
 24
 This dispute arises over the fact that the complainant charged its entire repair and maintenance labor costs to the alcohol program. OPA auditors in computing these amounts reached an estimate as to how much labor had actually been expended on the alcohol program. They arrived at a 75% allocation to government production and 25% to non-government operations. The complainant contends that the proportionate allocation should have been 90% and 10% respectively. This issue concerns wages paid to complainant's own repair and maintenance employees. The complainant has not produced evidence establishing that its figures are more accurate than the figures arrived at by the OPA auditors. Therefore, we cannot set aside the Director's order in this regard.
 
 
 25
 D. Watchman's Wages.
 
 
 26
 We believe that the complainant's objections to this charge of $2,664.38 should have been sustained. It appears that the Government required that a watchman be employed to guard the facilities engaged in Government production. The complainant never required the services of a watchman prior to this time and it is uncontroverted that a watchman was employed solely at the Government's insistence. The complainant nonetheless offered to accept a 90%-10% allocation of the charge. The board of review recommended that the item be charged entirely to the cost of Government alcohol, under the circumstances shown. The Director, however, made a 50%-50% allocation which he based upon the value of the property guarded. He argues that this proportion is fair and that, granting that this expense would not have been undertaken by the complainant except for the Government contract, the fact that the Government insisted upon certain minimum standards of prudence and care does not call for the complete ignoring of the benefit which accrued to the complainant in having its other properties guarded. We do not believe that a benefit should be forced upon the complainant and since the watchman would not have been hired except for the Government's requirement, we hold that the wages of the watchman should be charged solely against the alcohol program. The Director's order on this claim will be set aside.
 
 
 27
 E-H. Salaries of Mann, Maynard, Krauss and Levy.
 
 
 28
 The controversy here is whether part or all of these salaries should be charged against alcohol production as indirect production expense in the case of Mann, Maynard and Krauss and direct labor expense in the case of Levy. The board of review recommended that 50% of the salaries of Mann, Krauss and Levy be apportioned to indirect production expense. However, the Director rejected the recommendation and concluded that these salaries could not be charged directly against the alcohol program but in the cases of Mann and Krauss were correctly transferred by the auditors to general and administrative expense which was chargeable to alcohol production only within the limits fixed by the regulation. Levy's salary, he held, should be charged solely to the complainant's private bottling house operations. Both the board and the Director disallowed the claim as to Maynard's salary.
 
 
 29
 Louis Mann was president of complainant company. It is contended that he performed the duties of "Plant Engineer". The Director, however, viewed these duties as purely administrative in character and not such as to call for classification as a plant expense. The Board of Review concluded that his long experience qualified him, and the fact that skilled personnel were not available during the war made it necessary for him to act as plant engineer and to solve the difficult problems of conversion to alcohol production as they arose and that although he did not keep a check of the time spent in the plant in alcohol production, he had the prime responsibility for the whole operation which was entirely different from peacetime operation of a whiskey distillery. It is contended that he was paid a flat salary of $13,000 for these services and was on 24-hour call. During peacetime he had been paid a nominal salary and a commission on all sales made. Our review of the evidence satisfies us that it supports the complainant's position, as the board of review held, and that the Director's findings are not supported by substantial evidence. Accordingly 50% of Mann's total compensation, adjusted to eliminate the portion earned during the whiskey holidays, should be allowed as indirect production expense. The amount thus allowed should, of course, be eliminated from general and administrative expense. The Director's order will be set aside in this regard.
 
 
 30
 G. T. Maynard was secretary of complainant company. He assisted Mann and acted as a general plant supervisor. On this ground, the complainant contends that 50% of his entire salary should be charged as indirect production expense. The OPA auditor disallowed ½ and transferred the other ½ to general administrative expense. However, the complainant contends that this was error and that ½ should have been charged as indirect production expense. The Director disallowed this item on the ground that no evidence of payment had been submitted. This was clearly not error on the part of the Director.
 
 
 31
 George Krauss was complainant's salesman before the alcohol program and was pressed into duty because of his distillery knowledge. The complainant contends that his duty was to assist Mann in his work as production manager. He was required to travel to locate vital materials and when not travelling he was employed directly in the distilling plant. The board of review recommended that 50% of Krauss's salary be allocated to indirect alcohol production. The Director rejected the recommendation. We think, however, that the Director erred in this regard and that Krauss's salary should be treated on the same basis as was Mann's, for the same reasons as in the case of Mann. The Director's order will accordingly be set aside as to this item.
 
 
 32
 The complainant's charge of 50% of the salary of Sidney Levy to alcohol production expense was disallowed by OPA auditors on the ground that Levy was carried on the payroll as bottling house superintendent, a position which related exclusively to whiskey operations. The board recommended that 50% be apportioned to alcohol expense. The Director, however, found that the evidence as to Levy's duties was too vague and in the absence of clear proof to the contrary, the Director concluded that this claim should be disallowed. In view of the evidence of the complainant's own records and its failure to produce satisfactory evidence to the contrary, we cannot hold that the Director's finding is not supported by substantial evidence.
 
 
 33
 I, V. Wages for truck driver, David Shaffer.
 
 
 34
 For some unaccountable reason, Shaffer's wages are divided between two claims. One is for $270.77 for direct labor and the other is in the amount of $670.95 as an indirect labor cost. Yet in each claim the same type of services are alleged to have been performed. Shaffer was employed as a truck driver. The Director disallowed this claim because OPA auditors reported that the Dodge and International trucks, of which he had charge, could not be used to transport spent grain from alcohol production, known as slop, but were used for transporting whiskey. There was, however, uncontradicted evidence that the two trucks were used in the hauling of slop throughout the alcohol program by affixing to the trucks auxiliary tanks. There was also uncontradicted evidence as to the hours Shaffer worked at the distillery and for other work. We think that the Director's findings as to these claims have been shown to be erroneous and that the claims should have been allowed. His order will accordingly be set aside as to this item.
 
 
 35
 J. Payroll Tax.
 
 
 36
 This item follows the disposition made of the salary and wage claims.
 
 
 37
 K. Repairs and Maintenance Materials.
 
 
 38
 This is a confused and complicated matter. The crux of the controversy lies in the fact that the complainant contends that under the special circumstances of this case an item which ordinarily would be regarded as a capital improvement and amortized over its useful life should be charged off as a terminal expense at the end of the contract period. The special circumstances alleged are that additions and enlargements were made at the insistence of the Defense Supplies Corporation and that these were useless after the contract period. The complainant's claims for reimbursement for remaining depreciated costs were rejected as were the board's recommendations on the subject. The Director on the contrary found that the additions, enlargements and replacements made by the complainant were not made at the direction of Defense Supplies Corporation and that on the evidence submitted the complainant's assertion of post-war lack of utility and value of the additions and charges made during the war contract was unsupported.
 
 
 39
 Two questions are presented. The first is the propriety of the administrative disallowance of $6,780.65 as expense not incurred for the Government program, and the second is the propriety of the denial of complainant's claim to reimbursement of its capital expenses of $32,205.08 as a terminal cost on the theory of obsolescence.
 
 
 40
 We are satisfied that the Director's disposition of the first issue was correct. On the second issue we think that the Director was correct as to all but one item. One item, however, should have been permitted to be written off as obsolescent. That is the cost of the watchmen's gatehouse, amounting to $1,456.69. Having found that the watchman's salary should be charged in toto against the alcohol operation, it follows that the gatehouse which was only built for the alcohol program should be charged as a terminal expense. The Director's order will be set aside as to this item. As to all other items under this heading we sustain the Director.
 
 
 41
 L. State License Fee.
 
 
 42
 The complainant obtained a state license although it was not required under the state law to have a license to produce alcohol for the Government. A large part of this claim was disallowed although the auditors did allow part of it. The complainant contends that this payment was an error made in good faith. However, it is apparent that the license was required during any whiskey holiday periods. We think that the claim has no merit.
 
 
 43
 M. Slop Credits.
 
 
 44
 This presents another difficult issue. On the basis of an affidavit of an OPA auditor, Schenkel, of March 30, 1948, that he had seen a memo-book of slop sales from which he had taken figures and that the sales stopped as of June 9, 1944, when he had used the book, the Director imputed an income of $500.00 per quarter during the period involved for these sales to the complainant. Mann admitted that sales were made during the fourth quarter, 1943, and first quarter, 1944, and that the money was used as petty cash, but denied that any loose leaf record had been kept or that any sales had been made during the period involved in the orders. His excuse for not selling the slop during later periods was that the plant had a limited capacity for storage, that farmers called for it if it was given away, that it was not disposable, and that finally they purchased a farm that was used exclusively to dump this spent grain. The Director independently examined all the "conflicting and contradictory" evidence and determined that an income of $500.00 per quarter be imputed to the complainant and accordingly charged the complainant with these sales. The Board recommended that complainant's claim be granted on the ground that there was no evidence that such sales were possible whereas there was positive evidence that such sales were impossible. The Director rejected the recommendations. We think that in doing so he clearly erred and that the complainant's contentions in this respect must be sustained. His order will, therefore, be set aside as to this claim.
 
 
 45
 N, O, P. Auditors' Fees.
 
 
 46
 We think that the Director's determinations on these issues have not been shown to be incorrect. They are accordingly sustained.
 
 
 47
 Q. Car Service.
 
 
 48
 The board of review recommended that this claim be apportioned in the same manner as the apportionment of the salaries of Mann and Krauss, 50% to general and administrative expense and 50% indirect production expense. The Director stated in his brief that he is satisfied to have this Court's disposition of the apportionment of those salaries control the disposition of this claim. Accordingly the order of the Director as to this claim will be set aside.
 
 
 49
 R. Truck Service.
 
 
 50
 We think that this item must be treated in the same way as the wages of Shaffer, the truck driver. Accordingly the Director's order as to this item will be set aside.
 
 
 51
 S. Telephone and Telegraph Service.
 
 
 52
 The Director charged this expense to general and administrative expense. We see no error in his so doing.
 
 
 53
 T. Traveling Expenses.
 
 
 54
 The complainant claimed the sum of $1,116.99 for travel expenses to keep the distillery in operation. Only $750 was substantiated by evidence. The Director charged this amount as an administrative expense. There was no error in doing so.
 
 
 55
 U. Adjustment of DSC alcohol under 190 proof.
 
 
 56
 This is a claim for $109.17 made on the ground that the OPA auditor incorrectly computed the fixed fee due to complainant based on the fee per gallon allowed by the regulation. The complainant contends that the auditor used a method of multiplying the number of gallons produced by the fee allowed in a manner which resulted unfavorably to the complainant. This claim was disallowed by the Director on the ground that there was lack of evidence. However, it appears to us to be a simple arithmetical problem. The multiplication of so many gallons by 4¢ or 2¢ should not require "evidence". If the auditor did use a method of computation which resulted in any other amount than that required by the regulation, then the sum should be correctly computed. MPR 28 calls for a fixed fee of 4¢ per gallon while Order 108 provides for 2¢ per proof gallon. In all justice, if the complainant has not been paid what is due it, this should be corrected. The order of the Director will be set aside as to the claim. W. Clean-up Expenses.
 
 
 57
 This item was disallowed by the Director on the basis that it represented a post-contract expenditure. We think that this was right and that the finding should not be disturbed.
 
 
 58
 A judgment will be entered setting aside the order of the Director of June 28, 1950, to the extent indicated in this opinion and remanding the cause to him with directions to enter an amended order disposing of the complainant's protest in a manner not inconsistent with this opinion.
 
 
 
 Notes:
 
 
 [1]
 Maximum Price Regulation No. 28, issued February 22, 1943, provided the formula for establishing the maximum prices for ethyl alcohol. Its pertinent provisions follow:
 "§ 1412.263 Appendix A: Maximum prices for ethyl alcohol.
 * * *
 "(h) Sales of certain ethyl alcohol to the Defense Supplies Corporation. (1) The maximum price for the sale by any plant to the Defense Supplies Corporation of ethyl alcohol of 190 proof distilled from grain shall be the maximum price set forth in paragraphs (a) to (d) of this section, or a maximum price computed pursuant to the formula below * * *
 "Maximum price per gallon of 190 proof ethyl alcohol f.o.b. works shall be the sum of the following cost items per gallon, less the recovered value of dried feed, fusel oil and the like, plus a margin for profit computed pursuant to subparagraph (2):
 (i) Direct materials.
 (ii) Direct labor.
 (iii) Miscellaneous direct production charges.
 (iv) Indirect production expenses.
 (v) Miscellaneous direct expenses.
 (vi) General and administrative expense, not in excess of $.03 per gallon.
 * * *
 "(2) The per gallon margin of profit shall be allowed on the alcohol produced in each plant as follows: For each gallon produced and sold to the Defense Supplies Corporation during a calendar quarterly period, up to and including 750,000 gallons, 4 cents per gallon; for each gallon produced and sold during a calendar quarterly period over 750,000 gallons and up to and including 1,500,000 gallons, 3 cents per gallon; and for each gallon produced and sold during a calendar quarterly period over 1,500,000 gallons, 2½ cents per gallon. However, for any calendar quarter after June 30, 1944 in which a plant suspends production of alcohol for the Defense Supplies Corporation to produce distilled spirits for private account or for reasons connected therewith, the average per gallon margin of profit included in the settlement for that quarter shall not exceed that received during the preceding quarter for production at that plant for Defense Supplies Corporation.
 "(3) Maximum prices computed pursuant to the formula contained in subparagraph (1) of this paragraph shall be determined for the ethyl alcohol produced during each calendar quarterly period and shall be based upon the actual costs of producing such ethyl alcohol. Until the actual costs for a quarterly period are determined, the price shall be an estimated price. Within twenty days after the end of each calendar quarterly period, each seller computing a maximum price pursuant to the formula contained in subparagraph (1) shall submit to the Office of Price Administration, Washington, D. C., upon a form to be obtained from that Office upon request, a report of the actual costs of producing the ethyl alcohol sold to the Defense Supplies Corporation during such period. The estimated price shall be adjusted upward or downward in accordance with the report of actual costs filed with the Office of Price Administration. A maximum price so determined shall be subject to disapproval in writing at any time by the Office of Price Administration, and if a maximum price reported pursuant to this paragraph is revised downward by the Office of Price Administration and if any payment has been made at a price higher than the price approved by the Office of Price Administration, the seller shall refund the excess. The Office of Price Administration may adjust any prices which in the judgment of the Administrator appear to be unreasonable and excessive in the light of the past and current experience of the particular plant, after giving due recognition to legitimate causes of cost differences. For any calendar quarter in which a distiller suspends production of alcohol for the Defense Supplies Corporation to produce distilled spirits for private account, the Office of Price Administration shall apply such rules as may be necessary, and in accordance with recognized accounting procedure, to secure an equitable apportionment of the costs, including shut down costs and general and administrative expenses, as between alcohol produced for Defense Supplies Corporation and alcohol produced for private account.
 "(4) All cost computations and maximum price determinations and reports made pursuant to the formula contained in subparagraph (1) of this paragraph shall be on the basis of a gallon of 190 proof ethyl alcohol. Where ethyl alcohol of a proof other than 190 proof is sold, it shall be billed and paid for on the basis of an equivalent gallonage of 190 proof ethyl alcohol.
 "(5) Where a converted alcoholic beverage distillery determined a maximum price for sales to the Defense Supplies Corporation for the calendar quarterly period ended June 30, 1943, under § 1412.263(h) as it existed prior to July 1, 1943, such converted distillery may at its option adopt as its maximum price for the period ended June 30, 1943, the maximum price so previously determined or a maximum price computed on the basis of its actual costs during the calendar quarterly period ended June 30, 1943."
 
 
 [8]
 F.R. 2339, 2340-2342, as amended by Amdt. 3, effective July 1, 1943, 8 F.R. 9016; Amdt. 4, effective September 25, 1943, 8 F.R. 12879; Amdt. 6, effective April 24, 1944, 9 F.R. 4198; Amdt. 9, effective October 11, 1944, 9 F.R. 12412; Admt. 10, effective November 11, 1944, 9 F.R. 13209
 Order 108, issued October 22, 1942, under § 1499.3(b) of General Maximum Price Regulation (7 F.R. 3153), provided the formula for establishing the maximum prices for high wines. Its pertinent provisions follow:
 "§ 1499.972 Authorization to sellers of high wines. (a) Specific authorization is hereby given to any producer of spirits distilled from grain at less than 188 proof (`high wines') to determine by the following formula a maximum price for such high wines sold by him to the United States Government or any agency thereof * * *
 "Maximum price per proof gallon f.o.b. works shall be the sum of the following cost items per proof gallon, less the recovered values of dried feed, fusel oil or the like, plus two cents per proof gallon:
 (1) Raw materials.
 (2) Direct labor.
 (3) Conversion costs.
 (4) Plant overhead.
 (5) General and administrative expense, not in excess of 1.5 cents per proof gallon.
 * * *
 "(b) Maximum prices computed pursuant to the formula contained in paragraph (a) shall be determined for the high wines produced during each calendar quarterly period and shall be based upon the actual costs of producing such high wines. Until the actual costs for a quarterly period are determined, the price shall be an estimated price.
 "(c) Within twenty days after the end of each calendar quarterly period, each seller computing a maximum price pursuant to the formula contained in paragraph (a) shall submit to the Office of Price Administration, Washington, D. C., a report, upon a form to be obtained from that Office upon request, of the actual costs of producing high wines during that period. The estimated price shall be adjusted upward or downward in accordance with the report of actual costs filed with the Office of Price Administration. The maximum price so determined shall be subject to disapproval in writing at any time by the Office of Price Administration, and if a maximum price reported pursuant to this paragraph is revised downward by the Office of Price Administration and if any payment has been made at a price higher than the price approved by the Office of Price Administration, the seller shall refund the excess. The Office of Price Administration may adjust any prices which, in the judgment of the Administrator, appear to be unreasonable and excessive in the light of the past and current experience of the particular plant, after giving due recognition to legitimate causes of cost differences. For any calendar quarter in which a distiller suspends production of high wines for the United States or any agency thereof to produce distilled spirits for private account, the Office of Price Administration shall apply such rules as may be necessary, and in accordance with recognized accounting procedure, to secure an equitable apportionment of the costs, including shutdown costs and general and administrative expenses, as between alcohol produced for the Government and alcohol produced for private account.
 * * *
 "(e) This Order No. 108 may be revoked or amended by the Office of Price Administration at any time and the Office of Price Administration may at any time adjust any price established hereunder.
 "(f) This Order No. 108 (§ 1499.972) shall become effective October 22, 1942.
 "(g) Where a seller of high wines determined a maximum price for the calendar quarterly period ended June 30, 1943 under this order as it existed prior to July 1, 1943, such seller may at his option adopt as his maximum price for the period ended June 30, 1943 the price so previously determined under this order or a maximum price computed on the basis of his actual costs during the calendar quarterly period ended June 30, 1943."
 
 
 [7]
 F.R. 8608, 8609, as amended by Amdt. 2, effective July 1, 1943, 8 F.R. 8947; Amdt. 5, effective October 14, 1944, 9 F.R. 12280; Amdt. 6, effective October 11, 1944, 9 F.R. 12411, 12412