# IN THE COURT OF APPEALS OF IOWA

No. 18-1186
Filed September 25, 2019

**OLMSTEAD CONSTRUCTION, INC.,**
        Plaintiff-Appellee/Cross-Appellant,

**vs.**

**OTTER CREEK INVESTMENTS, LLC,**
        Defendant-Appellant/Cross-Appellee.
_____

Appeal from the Iowa District Court for Linn County, Kevin McKeever, Judge.


Olmstead Construction, Inc. and Otter Creek Investments, L.L.C. both appeal following resolution of their contract dispute. **AFFIRMED IN PART AND REVERSED IN PART ON APPEAL; CONDITIONALLY AFFIRMED ON CROSS-APPEAL; AND REMANDED.**


Dana L. Oxley and Kevin J. Caster of Shuttleworth & Ingersoll, P.L.C., Cedar Rapids, for appellant Otter Creek Investments, LLC.

Jeffrey A. Stone and Chad D. Brakhahn of Simmons Perrine Moyer Bergman PLC, Cedar Rapids, for appellee Olmstead Construction, Inc.


Heard by Doyle, P.J., Blane, S.J.* and Lloyd, S.J.*

*Senior judges assigned by order pursuant to Iowa Code section 602.9206 (2019).

**DOYLE, Presiding Judge.**

The parties to a dispute over a construction contract ask us to review the district court's determination of various contract terms that affect the damages, attorney fees, and interest awarded in a breach-of-contract claim. We must also determine whether the district court erred by refusing to foreclose on a mechanic's lien.

We affirm the judgment entered in favor of Olmstead Construction, Inc. (Olmstead Construction) on its breach-of-contract claim but reverse the awards of $48,150 in damages for electrical costs and $47,787.73 in attorney fees. We conditionally affirm the denial of Olmstead Construction's petition to foreclose on its mechanic's lien and affirm the district court in all other respects. We remand the case for further proceedings in conformance with this opinion.

**I. Background Facts and Proceedings.**

Brothers Don and Joe Burd decided to open a convenience store and gas station in Robins and formed Otter Creek Investments, LLC (Otter Creek) for that purpose. Otter Creek hired Olmstead Construction to build the store. In May 2014, the parties entered a cost-plus contract, which requires the owner to pay the contractor for construction costs plus a percentage markup. Otter Creek agreed to reimburse Olmstead Construction for its construction costs and pay a seven-percent markup on those costs. The contract also required Olmstead Construction to act as the project manager, which entailed obtaining subcontractor bids, supervising their subcontractor work, and processing and paying subcontractor invoices. Olmstead Construction would then bill Otter Creek for the subcontractor costs plus the seven-percent markup on those costs.

In July 2014, Olmstead Construction provided Otter Creek an initial estimate of the total cost of construction, which it projected to be $1,204,774. Construction began. During 2014, Olmstead Construction billed Otter Creek for work totaling $81,093.16. Otter Creek paid Olmstead Construction this amount in December 2014.

By the end of the year, Otter Creek realized it needed to scale back the cost of the project due to financing issues. As a result, it redesigned the construction plans between December 2014 and May 2015 with Olmstead Construction's help. Based on Otter Creek's changes to the plans, Olmstead Construction submitted a revised estimate of the total cost of construction on April 5, 2015, which it projected to be $962,535. Two days later, Olmstead Construction submitted a new estimate, this time projecting a total cost of $948,132.

One way in which Otter Creek tried to reduce the cost of the project was to contract directly with some subcontractors, eliminating the seven-percent markup Olmstead Construction would otherwise receive for that subcontracted work. One subcontractor Otter Creek opted to contract with directly was Streff Electric, the electrical subcontractor. The parties agreed that Otter Creek would pay Streff Electric directly for the portion of the electrical work running to the gas pumps while Olmstead Construction would oversee the work Streff Electric performed inside the store. Olmstead Construction's revised estimates reflect this change.[1]

Olmstead Construction received invoices from the subcontractors it supervised, while those contracting directly with Otter Creek submitted invoices to

---

[1] The revised estimates include a line for electrical work but list it as "Electrical (No electrical at Gas Pumps)."

Don Burd. Daniel Olmstead, the owner and president of Olmstead Construction, testified, "We pay strictly off whatever invoices are sent to us." So when Olmstead Construction received invoices from Streff Electric for work on the gas pumps, Daniel Olmstead assumed Otter Creek was adding that expense back into their contract despite Otter Creek's silence on the matter. Because it received the invoice, Olmstead Construction paid Streff Electric for that work and added the expense to its invoice to Otter Creek. Unbeknown to Olmstead Construction, Otter Creek also paid Streff Electric for the electrical work on the gas pumps.

During 2015, Olmstead Construction billed Otter Creek for work totaling $778,432.84 in 2015. Don Burd noted some items listed as completed in an October 2015 invoice were for work that had not yet begun and asked for documentation of the costs. He never received the requested documentation. When Olmstead Construction sent a new invoice in December without documentation, Don Burd again asked for documents to verify the costs. Although Olmstead Construction never provided documentation, Otter Creek paid the total amount due in December 2015.

In February 2016, Olmstead Construction sent Otter Creek three invoices listing different amounts owed. An invoice dated February 9 shows a total project cost of $999,850 and an amount due of $102,930.84. An invoice dated February 12 shows a total project cost of $962,535 and an amount due of $102,928. Another invoice dated February 12 also shows a total project cost of $962,535 but an amount due of $35,483.16. When Otter Creek asked about the invoices, Olmstead Construction stated it had revised the invoices and would invoice for "extras" later.

Olmstead Construction sent a final invoice to Otter Creek on March 22, 2016. That invoice shows a total project cost of $1,058,869.82 and an amount due of $199,343.82. Confused about what the additional charges were for, Don Burd decided to wait to pay it until Olmstead Construction provided explanation or documentation of the costs. Olmstead Construction informed Otter Creek that it would file a mechanic's lien if Otter Creek failed to pay the invoice within thirty days. Olmstead Construction filed a mechanic's lien on April 12, 2016.

In June 2016, Olmstead Construction petitioned to foreclose the mechanic's lien for the remaining $199,343.82. Otter Creek counterclaimed for breach of contract and defective construction. Olmstead Construction amended its petition to add a claim for breach of contract, seeking prejudgment interest and attorney fees.

Following a bench trial, the district court found Olmstead Construction proved its breach-of-contract claim. It entered a $217,121.19 judgment for Olmstead Construction, which included $48,150 in damages attributable to work on the gas pumps.[2] Although the court found Olmstead Construction proved a valid mechanic's lien, it denied the petition to foreclose on it. It also found Otter Creek failed to prove its counterclaim. After both parties moved the court to reconsider its ruling, the court reduced the judgment entered against Otter Creek to $163,395.84, based on an error in its damage calculation.[3] The court awarded Olmstead Construction $47,787.73 in attorney fees and assessed interest from the

---

[2] This figure reflects the amount Olmstead Construction paid to Streff Electric for the work ($45,000) plus Olmstead Construction's seven-percent markup of that cost ($3150).

[3] Otter Creek has since paid Olmstead Construction $115,000 in partial satisfaction of the judgment.

date of judgment. Otter Creek appeals and Olmstead Construction cross-appeals.[4]

## II. Breach of Contract.

We review breach-of-contract claims for errors at law. *See Postell v. Am. Family Mut. Ins. Co.*, 823 N.W.2d 35, 41 (Iowa 2012) (stating the court reviews contract interpretation and construction for errors at law). Under this review, the district court's factual findings are binding on us if supported by substantial evidence. *See Metro. Prop. & Cas. Ins. Co. v. Auto-Owners Mut. Ins. Co.*, 924 N.W.2d 833, 839 (Iowa 2019). That said, the district court's legal determinations do not bind us. *See Westhoff v. Am. Interins. Exch.*, 250 N.W.2d 404, 408 (Iowa 1977).

> To establish breach of contract, a party must show:
>
> (1) the existence of a contract; (2) the terms and conditions of the contract; (3) that it has performed all the terms and conditions required under the contract; (4) the defendant's breach of the contract in some particular way; and (5) that plaintiff has suffered damages as a result of the breach.

*Iowa Arboretum, Inc. v. Iowa 4-H Found.*, 886 N.W.2d 695, 706 (Iowa 2016) (citation omitted). The parties stipulated to the existence of a contract, and the district court found that Otter Creek breached the terms of the contract by failing to provide prompt payment to Olmstead Construction for completion of the contracted work. On appeal, the parties challenge the district court's interpretation

---

[4] The table of contents in the parties' appendix lists trial exhibits but fails to provide descriptors of the exhibits. Iowa Rule of Appellate Procedure 6.905(4)(c) requires that if exhibits are included in the appendix "the table of contents shall . . . give a concise description of [each] exhibit (*e.g.*, 'warranty deed dated . . . '; 'photograph of construction site'; 'Last Will and Testament executed on . . . ')."

of various terms of the contract, which affect the amount of damages and the award of attorney fees.

### A. Payment for Electrical Work.

Otter Creek first challenges the portion of the district court's order awarding damages to Olmstead Construction to reimburse payments it made to Streff Electric for the work Streff Electric performed on the gas pumps. The court determined that the $45,000 Streff Electric billed for this work was "related to material, labor, or services provided for the purpose of the construction project." Because the contract required Otter Creek to pay Olmstead Construction costs plus seven percent, the court held Olmstead Construction had a right to recover $48,150 for the this work.

Otter Creek challenges the evidence that Olmstead Construction paid the $45,000 invoiced by Streff Electric for the work on the gas pumps. In the alternative, it argues that Olmstead Construction cannot recover payments to Streff Electric for the work on the gas pumps because this work is not a cost under the contract.

Assuming Olmstead Construction paid Streff Electric for wiring the gas pumps, Olmstead Construction cannot recover that amount from Otter Creek because the work is not a cost of construction under the contract. The contract states that Olmstead Construction proposes to furnish all labor, materials, and equipment to complete a list of items.[5] One of the items listed is "Electrical." The

---

[5] Some categories in the list have sub-lists that provide more information on Olmstead Construction's responsibilities. For instance, under the category of "General Conditions," it states that Olmstead Construction would coordinate all subcontractors on the project.

contract provides no further detail on the electrical work. But when asked to explain his understanding of Olmstead Construction's obligations under the contract, Daniel Olmstead testified:

> Electrical was all—mainly all we did on—or I guess what I'd say is the main thing we ever did on this building was the building only. There was a lot of other work that was completed around this project that was not included in our contract or in our proposal. So the electrical included everything that pertained to the building itself, which would have been the lights, the wiring, everything like that.

Likewise, Don Burd testified:

> A. On our initial meeting, we—I laid out the—what I needed him to perform. And it would be to construct the building, to manage the construction of the building, managing the subcontractors, obtaining all the bid work for the different particulars of the job, and submitting all that and—
> Q. Did you discuss whether or not the contract would include the fueling station, the pumps and so on? A. No. I told him that we had another contract for that portion of work.
> Q. So you discussed it but you told him you had another contractor? A. Yes, it was going to be the building only.

Olmstead Construction's July 2014 estimate also reflects that the scope of its work was limited to construction of the building. The estimate includes a more detailed list of Olmstead Construction's responsibilities, listing five categories of electrical work: (1) building, (2) paging and sound, (3) security system, (4) IP based CCTV, and (5) network cabling. Under the category of "Items furnished by owner," the estimate lists "Fuel tanks and pumping equipment" as item 11. Daniel Olmstead testified that the work Streff Electric performed on the gas pumps is the same work that the July 2014 estimate lists as "furnished by owner."

Daniel Olmstead testified he did not know that Otter Creek contracted directly with Streff Electric for the work performed on the gas pumps. Don Burd disputed this claim in the following testimony:

Q. Did you at any time tell Olmstead Construction that you were contracting directly with Streff Electric with respect to the fuel pumps? A. Yes, I would have. That is not in the scope of Olmstead's work that we had discussed.

Q. Did you have conversations at the very beginning of your relationship with Olmstead Construction about the scope of the work excluding the fuel pumps? A. Yes, we did.

. . . .

Q. Do you have reason to believe that Olmstead Construction at all times knew that you had contracted independently and separately with Streff Electric to provide services to the fuel pumps? A. Yes.

Q. And is there any reason to think that that changed at any point in time during the course of the construction? A. No.

Q. Would Olmstead have any reason to believe that they had suddenly taken off the obligation to provide electrical or any other construction services related to the fuel pumps? A. No.

The estimates Olmstead Construction provided in April 2015 further show that the electrical work on the gas pumps was not a cost by stating "(No electrical at Gas Pumps)" next to the line for the cost of electrical work. Olmstead admitted that when he prepared the April 2015 estimates, the scope of the contract did not include electrical wiring to the gas pumps. He also admitted that the final invoice Olmstead Construction sent to Otter Creek in March 2016 does not purport to include the electrical work to the gas pumps, instead listing as item 21, "Electrical (No gas Pumps)."

Daniel Olmstead assumed Otter Creek added the electrical work to the gas pumps back into the contract based solely on Olmstead Construction's receipt of invoices for that work from Streff Electric. He admitted he never received a change order from Streff Electric for the gas pump work. Olmstead also admitted that no one told him to add the cost of the electric work to the gas pumps back into the contract. When asked if it was a mistake for Olmstead Construction to charge or pay Streff Electric for the invoices on the electrical work performed on the gas

pumps, Olmstead testified, "I guess you can look at it any way you want to look at it. When an invoice comes to our office, the office girl automatically puts that in our system as a bill against that project. That's how it got put in here."[6]

It is true that an executory contract may be modified by one party with the consent of the other, even by implied acts and conduct. *See Tindell v. Apple Lines, Inc.*, 478 N.W.2d 428, 430 (Iowa Ct. App. 1991). But the district court never found the parties agreed to modify the contract. Rather, the court determined that Otter Creek was liable for Olmstead Construction's costs, and the mere fact that Olmstead Construction received an invoice from Streff Electric qualified that work as a cost of Olmstead Construction. The record does not support that finding.

Because the cost of the electrical work to the gas pumps is not a cost of the contract, Olmstead Construction is not entitled to the $48,150 awarded by the district court for that cost plus the seven-percent markup. Reducing the amount of the judgment awarded to Olmstead Construction on its breach-of-contract claim by this amount, we revise the judgment to award Olmstead Construction $115,245.84.

### B. Payment for Equipment Costs.

On cross-appeal, Olmstead Construction challenges the court's refusal to award reasonable costs for using its own equipment on the project. Based on the equipment rates provided by the Iowa Department of Transportation (IDOT), Olmstead Construction seeks an $83,342.34 increase in its award to compensate

---

[6] The three invoices in question were directed "To: Otter Creek Investments" with a descriptor of "Project: Otter Creek Outpost Pumps." Otter Creek received and paid these invoices before Olmstead paid on the same invoices. Although the president of Streff Electric testified at trial, he gave no explanation as to why the invoices in question were sent to both Otter Creek and Olmstead Construction. All other invoices Omstead received from Streff Electric were directed "To: Olmstead Construction" with a descriptor of "Otter Creek Outpost Station."

it for the cost of using a skid loader, a large forklift, several small tools, a delivery truck, insulated blankets, and concrete forms that it owns.

Olmstead Construction bought the equipment and used it on several projects before entering the contract with Otter Creek. Because the equipment is self-owned, Olmstead Construction cannot produce receipts for the cost of its use on the Otter Creek project. To calculate the "cost" of using this equipment, it presented testimony from Matt Olmstead, who has been working in the construction industry for twenty years and is the current president of Olmstead Construction. He provided two methods for calculating the reasonable cost of self-owned equipment. The first method allocates the equipment cost "as part of the wage rate for the project," which he testified was $60 per hour. Using this method, Olmstead Construction invoiced Otter Creek $33,130.98 for use of the equipment. The second method involves the equipment rate schedules provided by the IDOT, which Olmstead Construction sometimes use to determine the rates to charge for use of its own equipment or to rent its equipment to others. Using the IDOT equipment rate schedules, Matt Olmstead testified that Olmstead Construction could charge Otter Creek $83,342.34 for use of its equipment.

The district court determined that Olmstead Construction had no right to compensation for the use of its equipment, noting "the language to the contract indicated that [Olmstead Construction] would be paid cost plus seven percent." Because Olmstead Construction failed to prove "what its cost of providing the equipment actually was," the court "conclude[d] that to award damages for the provided equipment would amount to little more than speculation." In its expanded ruling, the court clarified that it "intended to afford [Olmstead Construction] the

amount of $0 for the rental equipment simply because [Olmstead Construction] failed to prove any cost associated therewith. Since the contract was for cost plus 7%, [Olmstead Construction] is entitled to recover $0 for the rental equipment."

Olmstead Construction argues the court erred by declining to award damages for its use of self-owned equipment because the cost was too speculative. It claims that Iowa has recognized that the cost of self-owned equipment is reimbursable under cost-plus contracts, citing our opinion in *Constructive Consultants, Inc. v. Banwart*, No. 12-1011, 2013 WL 988637, at *4 n.2 (Iowa Ct. App. Mar. 13, 2013). There, we quoted the following treatise language:

> It is important to carefully define which construction costs incurred by the contractor are to be reimbursed. It is typical to provide reimbursement for wages paid for labor and taxes; benefits; insurance costs based on those wages; rented equipment; subcontract costs; insurance costs; bonding costs; building permit costs; *costs of contractor-owned equipment (which can be controversial to determine)*; and costs of material.

*Constructive Consultants*, 2013 WL 988637, at *4 n.2 (emphasis added) (quoting Philip L. Bruner & Patrick J. O'Connor, Jr., 2 *Bruner & O'Connor on Construction Law* § 6:81). The same treatise notes that computing the cost of self-owned equipment "is extraordinarily complex and poses difficult cost accounting problems that few beyond experienced construction cost accountants and equipment dealers truly understand." 6 *Bruner & O'Connor on Construction Law* § 19:104, Westlaw (database updated June 2018) (footnotes omitted). However, the method used to calculate charges for contractor-owned equipment is less important than the parties' agreement as to the method. *See* Stephen A. Hess, *Construction Contract Pricing*, Construction Briefings No. 2008-7 (July 2008). For this reason,

the "traditional and accepted method" for determining actual costs of contractor-owned equipment is to include with the contract a schedule of the rates the contractor is entitled to bill for use of its own equipment. *See id.* "In the absence of such a schedule, the attribution of 'cost' to contractor-owner equipment can be a contentious and frustrating process for both parties." *Id.* Other ways to determine actual costs of contractor-owned equipment is by using equipment rate manuals and expert testimony if there is an "absence of accurate and complete accounting records from which actual costs may be determined." 6 *Bruner & O'Connor on Construction Law* § 19:104.

Olmstead Construction claims that it can recover the reasonable charge for renting its equipment in the area, citing *Olberding Construction Co., Inc. v. Ruden*, 243 N.W.2d 872, 877 (Iowa 1976). But that case involved an implied contract, not a cost-plus contract. *Olberding Constr.*, 243 N.W.2d at 875 ("There is no claim that an express contract existed as to the amount of compensation to be paid."). The supreme court noted that "where there is no agreement as to the amount of compensation, the law implies a promise to pay reasonable compensation." *Id.* Because another contractor who was knowledgeable with the amount charged for rental equipment in the area testified that the contractor's charges for rental equipment were reasonable, the court found substantial evidence to support the contractor's bill. *See id.* at 877.

The district court noted that Olmstead Construction "provided evidence that the equipment charges would have been reasonable" but failed to show the actual cost of the equipment's use. In other words, although it may have been reasonable for Olmstead Construction to charge an owner for the use of its equipment based

on either of the two calculations it provided at trial, there was no evidence that either figure related to the actual cost of using the equipment.

We agree that the IDOT rate schedules do not reflect the actual cost of using Olmstead Construction's equipment. Matt Olmstead testified that the IDOT's rate schedules provided an appropriate hourly rental rate to charge for construction equipment, not a rate for equipment that one owned. And the rates relate to highway construction rather than building construction. We also note that Olmstead Construction did not use this schedule when it initially billed Otter Creek for the use of its equipment. Using the IDOT rate schedules results in a charge more than $50,000 higher than the amount Olmstead Construction invoiced to Otter Creek. There is insufficient evidence to justify use of the IDOT rate schedules to calculate the cost of the equipment use.

The evidence regarding the so-called labor rate charged by Olmstead Construction is unavailing. Olmstead Construction provided two exhibits to illustrate its calculations for labor. An exhibit titled "Otter Creek Outpost Employee Breakdown" lists each laborer who worked on the project, the number of hours each worked, and the "raw cost" of employing each laborer based on the salary, benefits, and taxes Olmstead Construction paid. Next to the "raw cost" column is a column titled "other expenses," which Daniel Olmstead testified represents the hourly cost[7] for the use of its equipment by each laborer. A column combining "raw cost" and "other expenses" shows a final hourly rate for each laborer,[8]

---

[7] The hourly cost for the equipment used by each laborer, whether it was small tools or a skid loader, ranges from $7.36 to $8.92 per hour.
[8] This figure ranges from $51.94 to $62.89 per hour.

followed by a column showing the total project cost for each by multiplying that final hourly rate by the number of hours worked. Adding these amounts together, the exhibit shows a total cost of $233,640, the same amount Olmstead Construction shows as the total cost of labor for the project in its final invoice.

An exhibit titled "Billing Itemization" also shows the final labor cost of $233,640 based on a labor rate of $60 per hour, with labor expenses itemized:

| | |
|---|---|
| Union Wages, Benefits, Insurance, Medicare & Unemployment Taxes | $ 200,509.02 |
| Skid Loader | $ 13,580.00 |
| Large fork lift | $ 10,000.00 |
| Large truck | $ 2,000.00 |
| Small Tools | $ 3,000.98 |
| Insulated Blankets | $ 550.00 |
| Concrete forms | $ 4,000.00 |
| 3,894 Man hours @ 60.00/HR | $ 233,640.00 |

To justify its labor rate, Daniel Olmstead testified that the $60 per hour charge for labor is "very reasonable" in his experience. Matt Olmstead testified that Olmstead Construction uses a similar rate on about 80% of contracts involving reimbursable costs. When asked about the "other expenses" column listing equipment charges by laborer in the exhibit showing a breakdown of expenses by employee, Daniel Olmstead testified:

> What we end up doing—we do a lot of projects with a labor rate. Factories, other jobs we've done before, they want you to include everything. They don't want you to itemize out you're using the skid loader for two hours, you're using this for whatever amount of hours. This is included in our labor rate. We give somebody a labor rate, that's the labor rate. It includes the equipment.

However, nothing in the record indicates how Olmstead Construction calculated the hourly labor rate.

Because Olmstead Construction failed to prove the actual costs associated with use of its equipment, we affirm on this issue.

**C. Attorney Fees.**

The parties' contract states that

> any credit granted shall be paid promptly, in accordance with terms and agreements (net 30 days), that the credit grantor may add one and one half percent (1 1/2%) per month (18% per annum) to any balance owed over 30 days, and in event of default, to pay reasonable collection charges and/or attorney fees.

After the district court entered judgment in its favor on its breach-of-contract claim, Olmstead Construction asked the district court to award it $94,575.45 in attorney fees. The district court found it was reasonable to award Olmstead Construction $47,787.73 in attorney fees, one-half the amount requested.

On appeal, Otter Creek does not dispute that the contract allows recovery of attorney fees in the event of default. Nor does it dispute the reasonableness of Olmstead Construction's attorney fees. Instead, Otter Creek contends that Olmstead Construction is not entitled to an award of attorney fees because Olmstead Construction failed to perform under the implied terms of the contract. Otter Creek argues that the contract required Olmstead Construction to substantiate its costs as a condition precedent to payment and so Olmstead Construction's failure to do so excused Otter Creek from paying the final invoice. On this basis, Otter Creek claims it did not default under the contract and Olmstead Construction is not entitled to an award of its attorney fees.

The district court rejected Otter Creek's claim that the implied terms of the contract required Olmstead Construction to provide it with an accounting of the costs it was charging. The court determined:

Element 3 requires that [Olmstead Construction] fulfill all of the terms of the contract. [Olmstead Construction] argues that [it] has completed the terms of the contract and therefore satisfied element 3 of [its] breach of contract claim. [Otter Creek] claims that [Olmstead Construction] has not satisfied element 3. [Otter Creek] argues that [it] requested to know the specific items that constituted the costs that were being claimed. [It] further argues that [Olmstead Construction] failed to provide [it] with such costs and that such failure constitutes a material breach of the contract. [Olmstead Construction] argues that [it] provided all services required under the agreement in accordance with industry standards and completed construction of the project on February 26, 2016. The Court agrees with [Olmstead Construction]. The Court finds that the overwhelming evidence shows that [Olmstead Construction] was required to complete certain construction tasks that were part of the overall project. The Court further finds that [Olmstead Construction] completed each and every task according to the agreement and in accordance with industry standards. Therefore, the Court finds that [Olmstead Construction] has proven element 3.

Otter Creek argues that Daniel Olmstead's testimony supports its claim that the implied terms of the contract required Olmstead Construction to confirm its costs. On cross-examination, he testified:

Q. At the time that you signed this contract, May 14, 2014, was Olmstead Construction willing to show documentation to support the costs that it would incur? A. Yes.
Q. And would that documentation include invoices that you paid from your sub and suppliers as well as evidence of what you paid your employees? A. Yes.
Q. So do you agree that this contract at least assumed that you would supply that documentation? A. Yes.
Q. And that gives your customer protection from a contractor that might try to overcharge them for things that were not actually incurred? A. That is correct.
Q. And it's fair for a customer to ask to see those records to find out whether or not they are being overcharged? A. Yes.

The evidence also suggests that Olmstead Construction's common practice was to include documentation of its costs with every invoice.

But Olmstead Construction never provided Otter Creek with the requested documentation of its costs. Don Burd testified that Olmstead Construction did not

provide documentation of its costs until "way after the lawsuit was filed" and did not document its labor costs or equipment rental costs until a month before trial. Don Burd testified that he "didn't really understand" the change in final cost listed in the February 2016 and March 2016 invoices because he did not know what extra costs Olmstead Construction was billing and it provided no documentation of these costs. He also testified that when he learned that the total price of the contract had risen nearly $200,000 from the last estimate, it stunned him and he "had no idea that the costs were getting this out of whack." Don Burd explained why he did not pay the final invoice, testifying:

> I was trying to decipher what the costs were. I didn't . . . understand what the extra costs were for which items, and things had gotten mixed up here and there was no explanation, and I had never received any explanation or invoices documenting the cost through the whole project. So . . . until I figured this out of what the costs were for, the extras from the original 962,535, . . . I didn't know really how to go about figuring this out. I was trying to figure it out.
>
> Q. What happened next? A. Let's see. I believe Jenny [works in office at Olmstead Construction] sent an email that she included with this that if I had any questions to contact her or Dan [owner of Olmstead Construction].
>
> Q. What happened after that? A. . . . I was reviewing it so I sent her back an email that said I would be reviewing this and I'd get back with her.
>
> Q. Okay. What happened next? A. I believe she sent me an email that indicated that Dan was going to file a mechanic's lien on April 21st, I believe.
>
> Q. I've put on the overhead what was attached to the amended petition as Exhibit 1, and the Court can find that in the court records. It looks like this mechanic's lien was posted on April 12th, 2016. Does that comport with your recollection? A. Yeah, that looks like it.
>
> Q. What happened next? A. I was trying to figure out how to go about getting these costs for these items on these invoices. I hadn't received any supplement cost or anything on the entire project. The invoices were now no longer in the same categories as the original documentation so it made it impossible for me to track where my costs were, whether on the original one, whether concrete

was . . . what we agreed upon or whether it was less or whether it was more, I didn't know, high or low, . . . or what had gotten deleted. There was no accounting of it.

Although the court rejected Otter Creek's claim that Olmstead Construction had to provide documentation of its costs, its ruling notes the problem with Olmstead Construction's billing practices:

One of the major problems to [Olmstead Construction] being paid in accordance with the invoices has been [Olmstead Construction]'s seeming inability to provide accurate invoices to [Otter Creek] in a timely manner. At trial, [Olmstead Construction] has been able to prove [its] expenses. However, there has been considerable confusion regarding the invoices. Although communication problems can rarely be attributed to one party, the confusion in the instant case has overwhelmingly been due to the fault of [Olmstead Construction]. Olmstead [Construction] submitted its first "final invoice" to Otter Creek on or around February 9, 2016. This invoice was withdrawn and revised. Olmstead [Construction] submitted its second final invoice on February 12, 2016 (Exhibit 19). The e-mail communication submitted with this invoice reflects that Don Burd wanted all extras accounted for at the time of final payment. After revising the final invoice a second time, another invoice dated March 1, 2016 was submitted (Exhibit 20). The total amount Olmstead [Construction] alleged due on this invoice was $199,343.82. Don Burd received this invoice Tuesday, March 22, via e-mail (Exhibit M). At trial, [Olmstead Construction] claimed that the total amount owed by [Otter Creek] was $252,572.14. It is no mystery that [Otter Creek] was concerned about the accuracy of [Olmstead Construction]'s billing practices given this level of confusion.

This observation highlights the problem with awarding Olmstead Construction attorney fees. Is it fair to require Otter Creek to pay the final invoice without any documentation as to the costs listed? Did Otter Creek's desire to have an accounting of those costs before paying cause it to default on the contract? And if so, should it be required to pay Olmstead Construction's attorney fees when proper documentation could have revealed any errors in in the bill (such as the

double payment made to Streff Electric) and the parties could have addressed it without resorting to legal action?

No Iowa case has addressed whether a cost-plus contract requires the contractor to justify the expenses billed on a project. However, a cost-plus contract, by nature, demands that the contractor maintain accurate and detailed expense records. *See, e.g.*, *Joe Bonura, Inc. v. Hiern*, 419 So. 2d 25, 29 (La. Ct. App. 1982) (requiring a contractor to "itemize each and every expenditure made"); *Shaw v. Bula Cannon Shops*, 38 So. 2d 916, 918 (Miss. 1949) (stating contractor who agrees to perform on a cost-plus basis has a "duty to keep accurate and correct accounts of all material used and labor performed"); *Hitt v. Smallwood*, 133 S.E. 503, 506 (Va. 1926) (same); 17A Am. Jur. 2d *Contracts* § 484 ("Under a cost-plus contract, a contractor has the duty of itemizing expenditures made by him or her on the job . . . ."); Albert Hamilton Dib, 1 *Forms and Agreements for Architects, Engineers and Contractors* § 8:4, Westlaw FA-ARCHTCT (database updated June 2019) ("The cost-plus contractor is obliged to keep a detailed and accurate record for audit purposes."); Benjamin F. Sturgeon, *Fiduciary Duties in Cost-Plus Contracts for Construction*, 34 Construction Law. 24, 28 (Winter 2014) ("Contractors are held to an implied covenant of good faith and fair dealing and must keep clear and accurate records that account for all of the supplies and labor expended in each project."); Paul J. Walstad, Sr. & Camille Williams, *Contracting on a Cost-Plus Basis: The Owner's Relationship of Trust with the Contractor*, Construction Briefings No. 2000-12 (Dec. 2000) (noting most cases "impose upon the contractor the obligation to keep accurate and detailed records of its expenditures"). Contractors who fail to keep "meticulous cost records" may find

their expenses are not reimbursable. Walstad & Williams, *supra*. Likewise, costs based on estimates or approximations of expenses are insufficient. *See id*.; *see also Arc Elec. Co. v. Esslinger-Lefler, Inc.*, 591 P.2d 989, 992 (Ariz. Ct. App. 1979) ("The meaning of 'costs' is plain and definite in the sense that it denotes actual as opposed to average costs. The party performing under a cost-plus contract must keep a record of who worked on a given job and of his hourly wage. Approximations and averages are insufficient."); *Freeman & Co. v. Bolt*, 968 P.2d 247, 254 (Idaho Ct. App. 1998) (same). Rather, a contractor may only recover the costs actually incurred. *See Shaw*, 38 So. 2d at 918 (requiring that a contractor show the claimed expenditures "were necessarily paid for materials and work upon the job" to recover). Therefore, a contractor may be required to present invoices and statements of accounts accompanied by proof of payment. *See M. Carbine Restoration, Ltd. v. Sutherlin*, 544 So. 2d 455, 458–59 (La. Ct. App. 1989), writ denied, 547 So. 2d 355 (La. 1989); 17A Am. Jur. 2d *Contracts* § 484*.*

Keeping detailed records allows the owner to check on the contractor's expenditures. *See Shaw*, 38 So. 2d at 918; William Garth Snider, *Defamation Claims in Construction Litigation*, Construction Briefings No. 2000-7 (July 2000) (noting an owner can always challenge the reasonableness of costs incurred). Therefore, any contract requiring an owner to reimburse a contractor's costs implicitly allows the owner to approve the contractor's accounting system and audit contract costs and pricing data. *See* 1 *Bruner & O'Connor on Construction Law* § 2:26; *see also* Dib, 1 *Forms and Agreements for Architects, Engineers and Contractors* § 8:4 ("An owner who lets out a cost-plus job normally requires the contractor to use owner's approved accounting system or 'chart of accounts,' so

that contractor's records may be readily audited."). And if the owner disputes the billing, the burden is on the contractor to prove "each and every item of expense." *Joe Bonura, Inc.*, 419 So. 2d at 29; *see also* 17A Am. Jur. 2d *Contracts* § 484.

In *Sherwood Distilling Co. v. Ryan*, 190 F.2d 314, 321 (Emer. Ct. App. 1951), a government contractor asked the court to review the Department of Commerce's orders and regulations governing its cost-plus contract for the production of ethyl alcohol. In rejecting the contractor's argument about the department's audits of its costs, the court noted that such audits were "obviously necessary" if the department was to pay based on the contractor's own statement of cost. *Sherwood Distilling*, 190 F.2d at 319. The court observed "that it is the duty of a contractor under a contract on a cost-plus basis to keep adequate records to justify the actual costs reported and further to keep the usual documents to substantiate its claims for reimbursement." *Id.* at 321. The court then noted the contractor's failure to keep such documents "is the cause of much of the controversy in this case." *Id.* The same is true here. Had Olmstead Construction provided the explanation of costs Otter Creek requested, it would have eliminated much of the confusion regarding the Streff Electric invoices and, perhaps, the litigation in its entirety.

Otter Creek was not required to make final payment until Olmstead Construction provided the requested documentation of its costs. Because Otter Creek did not default under the agreement, Olmstead Construction is not entitled to an award of its attorney fees under the contract, and we reverse the award of $47,787.73 in attorney fees.

**D. Prejudgment Interest.**

Olmstead Construction contends it is entitled to prejudgment interest on its contract damages. It argues that interest should begin when damages are complete—here, thirty days after it issued the final invoice. In the alternative, it requested interest begin to run on the day it filed the action.

Generally, interest on unliquidated damages becomes due and payable on the date of judgment. *See Brenton Nat'l Bank of Des Moines v. Ross*, 492 N.W.2d 441, 443 (Iowa Ct. App. 1992). An exception occurs when damages are complete at a specific time, in which case interest runs from that time. *See id.* That exception is inapplicable, however, when a genuine dispute exists between the parties as to the amount of damages. *See id*; 13 Am. Jur. 2d *Building and Construction Contracts* § 88 ("[P]rejudgment interest will not be allowed on such claims . . . where a serious and substantial controversy exists as to the amount due under the contract.").

The district court determined that interest did not become recoverable until it entered final judgment because "damages were not complete at any specified time before the trial" and "the amount remained in controversy until the Court issued its final judgment." Under these circumstances, prejudgment interest is inappropriate. We therefore affirm on this issue.

**III. Mechanic's Lien.**

Olmstead Construction also appeals the denial of its petition to enforce the mechanic's lien. It contends it met all the statutory requirements for foreclosure and it is therefore entitled to foreclose on the lien. We review actions to enforce a mechanic's liens de novo. *See Flynn Builders, L.C. v. Lande*, 814 N.W.2d 542,

545 (Iowa 2012). On de novo review, we give weight to the district court's factual findings although they are not binding. *See id.*

In denying Olmstead Construction's petition to enforce its mechanic's lien, the district court again observed that Olmstead Construction's billing led to a genuine dispute over how much Otter Creek owed it. Rather than clarifying its invoice to Otter Creek, Olmstead Construction filed a mechanic's lien and initiated proceedings to foreclose on the lien. The court determined that "nothing in the statute . . . requires that the parties reach an agreement regarding the amount of money in dispute prior to filing a mechanic's lien." However, it denied Olmstead Construction's petition on equitable principles, concluding that "a plaintiff should not be permitted to invoice a defendant for an unsubstantiated amount of money and then subsequently foreclose on the defendant's property without providing the defendant with proof that the amount invoiced is actually valid." In denying Olmstead Construction's motion to reconsider on this issue, the court reiterated its conclusion, stating, "[Olmstead Construction] is largely responsible for creating this dispute due to their confusing and inaccurate billing. [Olmstead Construction] proposes foreclosure on the mechanic's lien. If the Court granted such foreclosure, it would amount to an extremely inequitable solution to a problem that is largely of [Olmstead Construction]'s own making."

Our mechanic's lien statute allows one who contracts with a landowner and furnishes material or performs labor to improve the land to place a lien on that land to secure payment. Iowa Code § 572.2 (2016). To perfect the lien, one must post a verified statement of account to the mechanics' notice and lien registry within two years and ninety days of the date on which material was last furnished or labor

was last performed. *Id.* §§ 572.8, .9. Once the mechanic's lien is perfected, a party may initiate an action to enforce it. *Id.* § 572.24.

> The purpose of a mechanic's lien
>
> is to protect persons who have supplied labor or material for the improvement of real property by giving the lienholder security independent of their contractual remedies against the owner of the land. The principle underlying the mechanic's lien statute is that a party who materially increases the value of the owner's property is entitled to look to the improved property as security for the effort.

*Winger Contracting Co. v. Cargill, Inc.*, 926 N.W.2d 526, 535 (Iowa 2019) (cleaned up) (citing Roger W. Stone, *Mechanic's Liens in Iowa*, 30 Drake L. Rev. 39, 41 (1980)). We liberally construe the mechanic's lien statute "with a view to promote its objects and assist the parties in obtaining justice." Iowa Code § 4.2. We also allow set-offs and counterclaims "to permit complete determination of the rights of the parties arising from a single transaction in the same action." *Capitol City Drywall Corp. v. C. G. Smith Const. Co.*, 270 N.W.2d 608, 611 (Iowa 1978).

Olmstead Construction has met the statutory requirements to foreclose on its mechanic's lien. However, we have flexibility in determining an equitable remedy. *See Hosteng Concrete & Gravel, Inc. v. Tullar*, 524 N.W.2d 445, 448 (Iowa Ct. App. 1994). "In questions of equity, the court has broad discretion to consider the hardship its orders would cause the defendant. Under the relative hardship doctrine, a court of equity should not grant an award that would be disproportionate in its harm to the defendant and its assistance to the plaintiff." 27A Am. Jur. 2d *Equity* § 102.

The record shows Otter Creek has paid $115,000 in satisfaction of judgment. Because we reduced the amount of the judgment entered in Olmstead

Construction's favor to $115,245.84, foreclosing on the mechanic's lien would disproportionately harm Otter Creek by forcing it to sell property that cost in excess of $1,000,000 in satisfaction of a $245.84 judgment. Noting that the delay in Otter Creek's payment is due largely to Olmstead Construction's billing practices, we grant Otter Creek thirty days from the date we file this opinion to satisfy the remaining judgment due of $245.84. If Otter Creek satisfies the judgment in this time, there is nothing owed on the contract, and Olmstead Construction is not entitled to foreclose on the mechanic's lien. *See Bidwell v. Midwest Solariums, Inc.*, 543 N.W.2d 293, 297 (Iowa Ct. App. 1995) (holding that when owner's damages exceeded that of the contractor such that the contractor is "in a negative position," "[i]t goes without saying" that the contractor is not entitled to foreclose on its mechanic's lien). If Otter Creek fails to satisfy the judgment in full within thirty days, the court shall grant Olmstead Construction's petition to foreclose on the mechanic's lien.

## IV. Conclusion.

We affirm the entry of judgment in favor of Olmstead Construction but reverse the award of $48,150 in damages and $47,787.73 in attorney fees to Olmstead Construction. We conditionally affirm the denial of Olmstead Construction's petition to foreclose on its mechanic's lien, and we affirm the district court in all other respects. Finally, we remand the case for further proceedings in conformance with this opinion. Costs of the appeal are taxed to Olmstead Construction.

**AFFIRMED IN PART AND REVERSED IN PART ON APPEAL; CONDITIONALLY AFFIRMED ON CROSS-APPEAL; AND REMANDED.**